

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 1 3 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 3 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re PAXIL LITIGATION | CASE No. CV 01-07937 MRP |
|  | **MEMORANDUM OF DECISION AND ORDER RE:** |
|  | **Motion for Class Certification** |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **Motion to Strike Designations of Hanke and Robinson** |
|  | **Motion to Strike Declaration of Karen A. Barth** |

## I. INTRODUCTION

Plaintiffs seek class certification, on behalf of many different classes of past or current Paxil users, in this action based on their various tort claims against defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Inc. ("GSK"). Paxil is available by prescription to treat, among other things, depression, panic disorder, obsessive compulsive disorder, and social anxiety. The Plaintiffs allege that patients have suffered severe withdrawal reactions after

discontinuing or attempting to discontinue Paxil,[1] and that these reactions belie GSK's claims that Paxil is not habit forming; indeed, Plaintiffs argue that the side effects have been so severe as to require warnings to patients taking Paxil - warnings, they contend, which were never given.

The original Motion for Class Certification ("Motion") was filed on August 1, 2002. The Motion sought certification of five different classes of Paxil users, distinguished by whether the plaintiff user was still on Paxil and the type of relief sought by that plaintiff. Simplicity was both the touchstone of the Motion's certification proposal and its ultimate downfall. The initial certification proposal, contrary to established Constitutional standards, failed to take into account differences in state law. As well, the Motion improvidently downplayed the individual factual and legal issues that inevitably arise when prosecuting a personal injury tort lawsuit that centers around the effects of a pharmaceutical drug on the human body.

In partial recognition of these problems, the class definitions were substantially overhauled in Plaintiffs' "reply" papers. To overcome the case management problems of applying fifty different state laws to the nationwide class, Plaintiffs now group the plaintiffs into their states of residence. These different classes

---

[1] While the Court does not review the substantive basis of the suit at the class certification stage, it does note for background purposes that Plaintiffs' core theory is somewhat vague. On the one hand, Plaintiffs allege a parade of horribles resulting from Paxil withdrawal. At the same time, Plaintiffs allege that Paxil, and selective serotonin reuptake inhibitors in general, provide little, if any, benefit beyond that of a sugar pill. While the two claims are not necessarily mutually exclusive, without much more elaborate explanation, they appear to be at best, uneasy partners.

can be briefly summarized as follows:

> Subclass 1: Rule 23(b)(2) class seeking injunctive relief in the form of medical monitoring.
>
> Subclass 2: actions for negligence.
>
> Subclasses 3-5: actions for breach of express warranty divided by jurisdictions based on whether privity needs to be shown.
>
> Subclasses 6-7: actions for breach of implied warranty divided by jurisdictions based on whether privity needs to be shown.
>
> Subclass 8: actions for violation of unfair competition laws subdivided into three further "sub-subclasses" based on differing elements in different states.
>
> Subclass 9-12: actions for strict liability divided by the extent to which the jurisdictions follow Restatement of Torts § 402A.

(Pl.'s [Corrected] Reply to Def.'s Opp'n to Pl.'s Mot. for Class Cert. ("Reply I") at 9-11.)

To demonstrate the feasibility of prosecuting this matter as a class action lawsuit, Plaintiffs have also proposed a two-stage trial plan. In Stage 1, the Court would try "all common questions pertaining to general causation and GSK's misleading commercial speech." (Reply I at 11.) In particular, the Stage 1 jury would determine "generic questions" such as whether Paxil can cause severe symptoms and whether certain of GSK's advertisements are misleading. All subclasses would be considered together during this stage and the jury would be given interrogatories tailored to allow the jury to reach answers for each of the different state groupings.

A Stage 1 jury verdict favorable to a particular subclass would allow each individual plaintiff in that subclass to proceed to Stage 2 where each plaintiff would litigate individual damages and causation before a different jury. At these individual "mini-trials," GSK could

refute whether each plaintiff has shown all the required elements (e.g., proximate cause) and / or assert any affirmative defenses (e.g., the learned intermediary doctrine).

## II. Legal Standard

Rule 23, which authorizes the use of class actions, has two main subsections. Rule 23(a) lists four requirements that must always be satisfied. Specifically, the class must be so numerous that joinder is impracticable, there must be questions of law or fact common to the class, the claims or defenses of the representative parties must be typical of the claims or defenses of the class, and the representative parties must fairly and adequately protect the interests of the class.

Rule 23(b) describes the three main types of classes that are certifiable and imposes requirements that must be met prior to certification of each type of class. Rule 23(b)(1) allows certification of a class where separate actions might either result in inconsistent or varying adjudications that would establish incompatible standards for the party opposing the class. Rule 23(b)(2) allows an injunctive relief class to be certified if the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive relief with respect to the class as a whole. Finally, Rule 23(b)(3) gives the court discretion to certify a class where questions of law or fact predominate and where a class action would be superior to other available methods for the fair and efficient adjudication of the controversy.

The party seeking class certification bears the burden of demonstrating it has met all four requirements of Rule 23(a) and at

least one of the requirements of Rule 23(b). *See General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). The Court is a fiduciary for the absent class members and must conduct an independent and "rigorous analysis" of the moving party's claims to examine whether the requirements of Rule 23 are met. *See id.* To meet its burden, the party seeking certification "must provide facts to satisfy these requirements; simply repeating the language of the rules ... is insufficient." *Bates v. United Parcel Service*, 204 F.R.D. 440, 443 (N.D. Cal. 2001) (citing *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977)).

Even where a case as a whole may be unsuitable for class action treatment, Rule 23 provides the Court some flexibility in separating the distinct issues and classes within the case in order to fashion a case suitable for class action treatment:

> When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

Fed. R. Civ. P. 23(c)(4). Since the purpose of Rule 23(c)(4) is to give courts the discretion necessary to advance judicial economy, courts have refused to apply Rule 23(c)(4) when such application would not significantly advance the litigation. Thus, use of Rule 23(c)(4) is generally rejected, for example, where the common issues are inextricably tied to the individual issues, *see, e.g., Emig v. Amer. Tobacco Co.*, 184 F.R.D. 379, 395 (D.C. Kan. 1998), or where the individual issues still make the case unmanageable, *see, e.g., Hamilton v. Accu-Tek*, 935 F.Supp. 1307, 1332 (E.D.N.Y. 1996), *rev'd. on other grounds.*

5

Where either the issues or the classes are subdivided, it is the separated issue(s) or class(es) that must each meet the requirements of Rule 23. Thus, for example, class certification solely with respect to liability requires that the issues and the class certified meet the requirements of Rule 23; that other non-certified issues or classes would violate Rule 23 is irrelevant. *See, e.g., Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.") (citations omitted). *See generally,* Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d* § 1790 (1986).

### III. Overview of Rule 23(a) Problems

For the reasons stated below, Plaintiffs motion for class certification must be denied as being inconsistent with both Rule 23(a) and Rule 23(b). This memorandum will begin with an overview of the problems plaguing Plaintiffs' proposed certification and trial plan. After broadly identifying these issues, the Court will then discuss how these problems make the proposed classes uncertifiable under each prong of Rule 23(a).

Generally, Plaintiffs' motion for class certification cannot meet Rule 23(a)'s requirements for two main reasons. First, Plaintiffs have failed to define a manageable class. Second, they have failed to demonstrate that a manageable trial plan exists that would make a class action lawsuit feasible.

**A. Manageable Class**

As Plaintiffs' class formulations now stand, they present two problems. First, Plaintiffs have failed to persuade the Court that they have defined proper classes. Second, Plaintiffs have failed to define the subclasses in a way that allows the parties, the Court, or the public to determine who would be included or excluded from the putative classes.

**1. Class Definitions**

A federal court sitting in diversity must generally apply the substantive law of the state in which each individual plaintiff resides. *See Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985). Belatedly recognizing the problem this poses to certification of a nationwide class, Plaintiffs have reformulated the proposed class definitions so as to group plaintiffs in states with similar laws together into subclasses or sub-subclasses. In so doing, Plaintiffs rely on the following statement from *Shutts*:

> We must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit.

*Shutts*, 472 U.S. at 816. This statement, Plaintiffs argue, is authority for the Court to group the various states with similar, though not necessarily identical, laws together for class certification and trial purposes.

The wisdom of employing such groupings - and more importantly,

the problems with attempting such a task - have been explicated by Judge Posner:

> We have hinted at the second reason for concern that the district judge exceeded the bounds of permissible judicial discretion.  He proposes to have a jury determine the negligence of the defendants under a legal standard that does not actually exist anywhere in the world. One is put in mind of the concept of "general" common law that prevailed in the era of Swift v. Tyson. The assumption is that the common law of the 50 states and the District of Columbia, at least so far as bears on a claim of negligence against drug companies, is basically uniform and can be abstracted in a single instruction. It is no doubt true that at some level of generality the law of negligence is one, not only nationwide but worldwide. Negligence is a failure to take due care, and due care a function of the probability and magnitude of an accident and the costs of avoiding it. A jury can be asked whether the defendants took due care. And in many cases such differences as there are among the tort rules of the different states would not affect the outcome. The Second Circuit was willing to assume dubitante that this was true of the issues certified for class determination in the Agent Orange litigation.
>
> We doubt that it is true in general, and we greatly doubt that it is true in a case such as this in which one of the theories pressed by the plaintiffs, the "serendipity" theory, is novel. If one instruction on negligence will serve to instruct the jury on the legal standard of every state of the United States applicable to a novel claim, implying that the claim despite its controversiality would be decided identically in all 50 states and the District of Columbia, one wonders what the Supreme Court thought it was doing in the Erie case when it held that it was unconstitutional for federal courts in diversity cases to apply general common law rather than the common law of the state whose law would apply if the case were being tried in state rather than federal court.  The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may as the plaintiffs have argued forcefully to us differ among the states only in nuance, though we think not, for a reason discussed later. But nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts. . . . The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch.

*Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995) (citations omitted).

Even if, in theory, nonmaterial differences could be overlooked without trampling due process rights, Plaintiffs here fail to carry their burden of showing, *prior* to class certification, that the differences in state laws within each of their groupings are nonmaterial. *See Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (noting that plaintiff bears the burden of establishing the four prerequisites of Fed. R. Civ. P. 23(a)). The fact that the reformulation of the classes occurred in their *reply brief* reflects the seemingly cavalier manner in which Plaintiffs have researched and briefed the groupings. In some cases, Plaintiffs summarily dismiss GSK's arguments against the groupings (Pl.'s Reply to Def. GSK's Second Resp. to Pl.'s Mot. for Class Cert. ("Reply II") at 23.) ("[T]he language of the relevant provision in the NJPLA is substantially the same as that for breach of implied warranty found within New Jersey's U.C.C. statute. . . ."); (Reply II at 22.) ("Similarly, it seems that GSK has overstated the significance of [Luke].") In other cases, Plaintiffs have been simply and outright wrong. (Reply II at 24.) ("New Jersey should have been listed in Sub-subclass (a) . . . Oregon should have been listed under Sub-subclass (b) . . . These inaccuracies have been corrected, and therefore do not result in any prejudice to GSK.")

Since the class certification question comes at a relatively early moment in most cases, some latitude is extended to Plaintiffs' class definitions. Were it simply the case that New York, for example, might ultimately be grouped in one subclass instead of another, the burdens and effects of such fluidity might be tolerable.

More worrisome is that New York's law requires it to be grouped not with another defined subclass, but in a new subclass altogether, thereby turning what is already a 13-subclass certification into something even more unwieldy.  The effects of this latter risk threaten to undermine whatever benefits class certification might otherwise provide.  In the face of this risk, the Court, like many others, is "not content merely to certify an action as a proper class suit and then suggest that all the problems raised by the parties may be adjusted or handled at a later stage."  Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1754 (1986).

### 2. Class Members

A second problem with the Plaintiffs' class certification proposal is that it defines classes in a manner making the actual composition only determinable at the conclusion of all proceedings.  The motion for class certification defines the putative classes as Paxil users (in various states) who have suffered "severe" withdrawal symptoms.  No definition is given for what constitutes "severe" symptoms.  As well, since individual plaintiffs will not testify until the Stage 2 trials, even a lengthy and precise definition would not enable the Court to determine whether a particular individual is part of the class until after Stage 2 is completed.  With the possible exception of the proffered class representatives, the putative class members can neither be identified nor its total size estimated.

This inability to ascertain which particular plaintiffs belong in the class gives rise to several problems.  For example, it makes it difficult for the Court to determine whether requirements such as numerosity and typicality are met.

Due process concerns abound as well. Since many Paxil users cannot know if they will be part of the class at this time, the Court doubts that those users can be provided notice adequate to allow them to make an informed decision whether to opt out. *See Valentino*, 97 F.3d at 1234.

Certifying the Plaintiffs in the manner proposed by their counsel might also hamper settlement efforts. As vaguely defined, the class size may include only a handful of individuals or possibly, many thousands of persons. Moreover, the severity of their symptoms could range anywhere from those causing several days of debilitation to those which could eventually lead to a fatality. With such varying scope of severity of symptoms suffered by members included in one class, an out of court agreement by the parties would appear virtually impossible. And even if the parties could agree on settlement, the Court's ability to judge the fairness of the settlement terms would be seriously impaired. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("Assessing a settlement proposal requires a district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement.") (citations omitted).

As an initial matter then, certification must fail because Plaintiffs have not met their burden of defining proper classes for the Court's consideration. *See Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (citing *In re School Asbestos Litig.*, 789

F.2d 996, 1010 (3rd Cir. 1986)); *see also Chin v. Chrysler Corp.*, 182 F.R.D. 448, 453 (D.N.J. 1998) (explaining that "certification of a nationwide class in which the law of the 50 states, rather than federal law, must be identified and applied, places the burden upon plaintiffs to credibly demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles.") (internal quotations omitted).

**B. Manageable Trial Plan**

Plaintiffs have also failed to demonstrate that the action could be managed as a class action lawsuit.  Plaintiffs propose a two-stage trial plan in which Stage 1 would focus on predominating common issues.  Among the questions posed by Plaintiffs that purportedly reflect predominating common issues are the following:

> Are GSK's statements misleading to American consumers?
>
> If some Paxil users have to taper off Paxil through a gradual dose reduction, is it truthful for GSK to assert that these users have no signs of dependence?
>
> Did GSK owe plaintiffs a duty of care?
>
> Was GSK negligent by making certain active misrepresentations and failing to disclose certain material facts?

(Barth Decl. II.)  In short, Plaintiffs argue that through selective isolation by this Court, common questions of fact and law exist making Rule 23 certification appropriate.

Plaintiffs' plan fails for four reasons.  First, Plaintiffs' own presentation of the trial plan highlights the proposal's complexity.  The trial plan, which sketches the proposed plan of action in only the broadest strokes, is itself six pages.  The description does not even begin to lay out the specific elements required to prove certain

causes of actions. The completed picture will no doubt be too vast and too complicated for even the most diligent jury to grasp. Thus, any attempt to proceed with this trial plan is bound to result in trial management problems and jury confusion.[2] *See Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332, 350 (D.N.J. 1997) ("For example, despite plaintiffs' burden to provide an 'extensive analysis' of state law variations, they have not explained how their multiple causes of action could be presented to a jury for resolution in a way that fairly represents the law of the fifty states while not overwhelming jurors with hundreds of interrogatories and a verdict form as large as an almanac.").

A second issue is Plaintiffs' attempt to separate issues of general causation from issues of individual causation. According to Plaintiffs' proposed trial plan, Stage 1 would not require the examination of any individual plaintiff:

> A determination of general causation is reached after a jury considers the scientific evidence on the subject. This evidence does not derive from any individual plaintiff, and it can be proven entirely without reference to any individual Plaintiff's [sic] symptoms.

(Reply I at 16-17.) When pressed by the Court at oral argument, however, Plaintiffs' counsel conceded that they did in fact intend to put individual plaintiffs on the stand during Stage 1.

Regardless of whether the generic causation showing is made by placing individuals on the stand or by introducing "scientific evidence," GSK would (fairly) assert that it is entitled to present evidence rebutting the existence or cause of the witness' or study

---

[2]  Since Plaintiffs propose, in the interest of "efficiency," to try all 13 subclasses in front of one jury during Stage 1, many of the benefits that might otherwise accrue from a Rule 23(c)(4) division are lost.

patients' illnesses, thereby introducing issues and complications meant to be reserved for Stage 2.  The theory and the benefits of bifurcation, when placed in actual practice, will prove to be ephemeral.

Other courts that have considered the issue have reached similar conclusions and have therefore declined to bifurcate in the manner proposed:

> The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom.  That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g. state of health, lifestyle) and the nature of their exposure to Agent Orange.  Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

*In re Agent Orange*, 818 F.2d 145, 165 (2d Cir. 1987).  *See also, Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 265 (S.D. Cal. 1988) (finding such arguments for generic causation issues "not persuasive"); *In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990) (rejecting proposal that "general causation" issue be tried because "[c]ommonality among class members on issues of causation and damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury").

*In re Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997), extensively relied upon by Plaintiffs, is not an alternative view that supports such bifurcation; rather it is an exceptional case in which the general rules and precautions against bifurcation of generic and proximate causation do not apply.  As the

*Telectronics* court itself noted, the controversy there appeared "to be the exception to the general rule that medical products liability actions require extensive proof of individualized issues." *Id.* at 288. This was so because the product at issue was an implanted medical device that allegedly fractured and caused physical damage to a patient's heart:

> Whether a fractured lead injured an individual implantee is a much simpler inquiry than in many medical products liability actions because it involves a direct and immediate wound to the body versus a latent, difficult to diagnose disease. For example, general resolution of the question whether a certain drug causes cancer or birth defects does little to determine if an individual's cancer was caused by the drug. This individual causation question tends to be the overarching issue in these cases, and it overshadows other less complex issues and precludes the common issues from predominating.

*Id.* at 289. Thus, though *Telectronics* is an instance in which a medical mass tort class certification was granted, the court there specifically recognized that the causation issues in that case were particularly black and white, as opposed to those encountered in a medical mass tort such as the one here.

Third, the Court is concerned that even if the case could be bifurcated, such bifurcation would present serious fairness issues for both parties. Initially, Plaintiffs' proposed bifurcation would present the case in a manner prejudicial to GSK:

> a class trial on liability without any reference to [defendant's defenses] runs "the real risk ... of a composite case being much stronger than any plaintiff's individual action would be ... [and] permitt[ing] plaintiffs to strike [Defendants] with selective allegations, which may or may not have been available to individual named plaintiffs."

*O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 415 (C.D. Cal. 2000) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*,

155 F.3d 331 (4th Cir. 1998)).

The trial plan also raises fairness issues within the plaintiff class. As noted above, the trial plan contemplates that every individual plaintiff must ultimately participate in a Stage 2 "mini-trial," each of which presumably must occur in this Court. It is thus foreseeable that the costs of traveling and the perceived burden of participating in a jury trial in a state in which the user does not reside may discourage many plaintiffs from participating in these Stage 2 trials.

Finally, the Court sees the individual issues in this case as an overarching barrier to class action treatment. The putative plaintiffs are many and their circumstances, varied. Paxil has been on the U.S. market since 1992. The putative plaintiffs thus took Paxil at various times, with different dosages, and for different underlying ailments. A large number of patients undoubtedly were also taking other drugs along with Paxil, with or without medical supervision.

Likewise, the symptoms and injuries allegedly suffered by the plaintiffs vary from individual to individual. Some patients are described as having to be "rushed to emergency rooms." Others "become disabled and cannot function at work or in society." The symptoms exhibited by these anonymous patients are not described with specificity. In all cases, however, the symptoms apparently also can cause "negative psychological impacts" on the patients. Moreover, some, though not all, plaintiffs are seeking monetary damages for "taking the drug when it is no longer needed or wanted" to treat an

16

underlying illness.[3]

Finally, because the putative plaintiffs all took Paxil at different times, some of those patients may have ingested Paxil and withdrawn from it before the advertisements at issue were aired or may have never seen the advertisements. With the information before it, the Court has significant doubts with respect to Plaintiffs' ability to show reliance, other than on a tedious case by case basis.

At oral argument, when questioned about some of the inherent flaws in Plaintiffs' proposed trial plan, Plaintiffs's counsel repeatedly stated that the proposed trial plan is merely a proposal for the Court to ponder and that other (perhaps more effective) options might be available in due course. At least in the Ninth Circuit, the presentation of a preliminary, unworkable trial plan, does not suffice for class certification. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (upholding denial of class certification where "there was no manageable trial plan adequate to deal with individualized issues and variances in state law").

## IV. The Factors Under Rule 23(a)

In describing the general problems posed by Plaintiffs' proposal, the Court must also point out that these problems seriously impede the Court's ability to comply with the mandates of Rule 23(a).

---

[3] The ambiguity of Plaintiffs' symptoms is heightened by the fact that the linkage of certain symptoms to Paxil withdrawal remains unbeknownst to either the patients or their physicians. As the Plaintiffs put it, many reactions "go unrecognized as withdrawal reactions by both patients and their physicians because GSK has failed to adequately inform them of the potential for such withdrawal reactions." (Reply I at 2.)

**A. Numerosity**

Rule 23(a)(1) requires that the proposed class be so numerous as to make joinder of all members "impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs allege that this requirement is met, as the putative plaintiffs number in the thousands. This claim, however, is not an entirely accurate one. As a practical matter, the number of people who have retained Plaintiffs' counsel or who have contacted Plaintiffs' counsel must certainly be a larger number than the number of those people who have actually suffered *severe* withdrawal symptoms as a result of *discontinuing Paxil*. Since the class definition revolves around the severity of a plaintiff's symptoms, and since those symptoms are not determined until Stage 2, there is no way to determine at this point how numerous the plaintiff class is.[4]

While there is no threshold number necessary to meet the numerosity requirement, the requirement cannot be met where the Court is unable to even estimate the number of class members. *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D. Cal. 1999) (finding numerosity not met when "[b]ased on the information presented to the Court, the number of possible class members could range from as few as the class representatives, and possibly some family and friends, to millions").

---

[4] Plaintiffs have also failed to show that each of its subclasses meet the numerosity requirement.

18

**B. Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Rule 23(a)(2) has been construed permissively:

> All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

*Staton v. Williams*, 2002 U.S. App. LEXIS 24125 (9th Cir. 2002) (quoting *Hanlon*, 150 F.3d at 1019).

The Court is not confident that Plaintiffs have shown that they meet Rule 23(a)(2)'s requirement. Plaintiffs argue that questions regarding Paxil's ability generally to cause withdrawal symptoms are common questions of facts. However, GSK's defense is not that Paxil may never cause withdrawal symptoms. Rather, it is that the symptoms are rare and that severe reactions are even more rare. It appears that the bulk of GSK's strategy is to show that to the extent patients exhibit severe symptoms, such symptoms are caused by a combination of other factors including possible relapse of underlying diseases. Hence, general causation does not appear to be a question at issue.

Plaintiffs also argue that common questions of law exist. Each of the 13 different subclasses, they argue, share "common" sets of legal questions. As noted above, the Court is not confident that each subclass does share common legal questions because of the possibility that the groupings may contain errors. Moreover, the specific facts of this case make it difficult to separate legal questions from factual ones.

Notwithstanding the Court's doubt, since the commonality requirement is interpreted to require very little, *see id.*, the Court

19

is willing to assume, for the purposes of its decision, that the commonality requirement is met.

## C. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. The class representative must be able to pursue his or her claims under the same legal or remedial theories as the represented class members. *See Kennedy v. Unumprovident Corp.*, 2002 U.S. App. LEXIS 23191 (9th Cir. 2002) (unpublished) (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)).

Here, in the absence of a clearly defined class, the typicality requirement cannot be met. Without knowing who is properly in the class, the number of people in the class, and the surrounding circumstances relating to each plaintiff's symptoms, there is no "generic" plaintiff properly typified by the class representatives. *See Valentino*, 97 F.3d at 1234. Moreover, the potential differences among the putative class members would force the class representatives to make difficult - and ultimately, legally impermissible - choices at trial. For example, a class representative who took only Paxil and not other prescription drugs might be tempted at trial, in order to make the case more understandable, to concede that other prescription medication could be equally responsible for severe symptoms. This would be the exact type of bartering that Rule 23(a)(3) forbids. *See*

20

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-28 (1997).

In focusing its typicality argument almost exclusively on the fact that there is a single defendant (GSK), a single drug (Paxil), and a single set of alleged misleading statements nationwide, Plaintiffs misconstrue the typicality requirement. While the *commonality* requirement might be satisfied by one unifying factual or legal question, the *typicality* requirement may not:

> Although the commonality and typicality requirements tend to merge into one another, they are stated differently. The commonality requirement is said to be met if plaintiffs' grievances share a common question of law or of fact. Typicality, by contrast, is said to require that the claims of the class representatives be typical of those of the class, and to be "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.

*Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (citations omitted). To state Plaintiffs' case another way, any case asserted against a single defendant and / or a single product would necessarily meet both the commonality and typicality requirements. This reading would render the typicality requirement meaningless and is not the law. *See Rodriguez v. Gates*, 2002 WL 1162675, *8 (C.D. Cal. 2002); *accord Valentino*, 97 F.3d at 1234 (typicality requirement not met where class representatives allege different injuries from those suffered by other class members).

In focusing on eliminating the conflicts among plaintiffs from different states, Plaintiffs have failed to take into account differences among plaintiffs that result from differing factual circumstances.

**D. Adequacy**

Resolution of two questions determines legal adequacy under Rule 23(a)(4): (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). Adequate representation "depends on the qualifications of counsel for the representative, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994) (citing *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir. 1992)).

Here, questions regarding typicality merge into questions regarding adequacy. As noted above, the ability of an individual to recover against GSK will likely turn on issues of actual causation. The determination of these issues is by necessity a process that requires a focus on the individual plaintiff and no class representative can possibly represent such individual plaintiffs without encountering a conflict of interest somewhere along the line. These conflicts make the class representatives and class counsel, despite their apparent best intentions, inadequate under Rule 23(a)(4).

## V. Rule 23(b)

Plaintiffs' motion for class certification also runs into problems with Rule 23(b).

22

## A. Rule 23(b)(3) Subclasses

The Rule 23(b)(3) subclasses comprise purchasers of Paxil prior to the label change on December 14, 2001, who suffered the withdrawal symptoms and who have monetary damages. Rule 23(b)(3) requires that common questions of law or fact common to the members of the class "predominate" and that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In addition, Rule 23(b)(3) lays out four nonexhaustive factors to be considered by the Court in determining whether the predominance and superiority criteria are met. Fed. R. Civ. P. 23(b)(3)(A) - (D).

### 1. Common Questions of Law or Fact Predominate

The "predominate" standard required by Rule 23(b)(3) requires a stronger showing by plaintiffs than the "commonality" standard required by Rule 23(a). See Hanlon, 150 F.3d at 1019.

Here, even if they could meet the commonality standard, Plaintiffs cannot meet Rule 23(b)(3)'s requirements. To begin with, the Court again reiterates its doubt as to Plaintiffs' groupings. Thus, the differing standards of liability required by laws of various states preclude a finding that common questions of law predominate. See, e.g., Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 (11th Cir. 1987); Mack v. General Motors Acceptance Corp., 169 F.R.D. 671, 678 (D.C. Ala. 1996) (calling case with varying state law claims "the antithesis of a class action").

Even if the groupings are appropriate, individual questions of fact regarding causation nevertheless subvert any benefits to be gained through a class action proceeding. Whether, and to what

extent, Paxil causes discontinuation symptoms varies from patient to patient. Not only do individual physiologies affect the causation issues, but so too do the underlying illnesses and medical history of each individual plaintiff. In the face of such facts, denial of class certification for failing to meet the "predominance" requirement is appropriate. *See Amchem*, 521 U.S. at 624; *Zinser*, 253 F.3d at 1189-90; *In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liab. Lit.*, 693 F.2d 847, 852-56 (9th Cir. 1982).

### 2. Superiority

It is obvious that the proposed trial plan would not be superior. Fed. R. Civ. P. 23(b)(3). The risk of jury confusion, when taken together with the risk of improperly grouping different states' laws, outweighs any possible advantages to be gained from certification of so many different classes in one nationwide case. *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679 (S.D. Cal. 1999) ("When individualized determinations must be made, and then applied under the gamut of state law, class certification would provide massive manageability problems for a court."); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 223 (E.D. Pa. 2000) (finding class action not superior where "[m]anagement problems are likely to result from the need to determine and apply the various states' consumer fraud acts").

The argument against such certification gains additional strength when one considers that the lack of certification will not necessarily prejudice Plaintiffs. Plaintiffs have asserted all along, as they must to meet the "numerosity" requirement, that the putative plaintiffs number in the thousands. (Pl. Mot. at 13.) (noting that Plaintiffs' counsel has been contacted by over 4,500 people and

24

retained by over 750 potential class members)  This argument, if it proves anything, proves too much.  With this many putative plaintiffs, Plaintiffs should have no problem forming classes in other jurisdictions that are large enough to justify the litigation expenses in other jurisdictions.  *See, e.g.*, *Boston Pneumatics, Inc. v. Ingersoll-Rand*, 65 F.R.D. 61, 65 (E.D. Pa. 1974) (denying class certification where such denial will not sound a "death knell" for plaintiffs' claims).

The Court is not persuaded that denial of class certification will result in thousands of individual lawsuits bogging down the court system with thousands of cases being litigated across the states.  What is more likely to happen is that the most compelling cases will be litigated first.  The results of these cases undoubtedly will encourage the parties to dispose of the remaining cases.

### 3. Factors to be Considered by the Court

Finally, when analyzing the proposed certification under the suggested factors set forth in Rule 23(b)(3)(A)-(D), the balance of the inquiry counsels against class certification.

The first factor to be considered is the interest of individual members in controlling the prosecution of separate actions.  The Court finds that this factor weighs in neither for nor against class certification.  On the one hand, the Court believes that certain individuals who have suffered large damages and who are not subject to unique defenses will not wish to be grouped with the remaining plaintiffs.  Indeed, Plaintiffs' counsel has represented to the Court that certain individuals are pursuing claims outside the class action mechanism.  On the other hand, the anticipated high cost of trial

25

means that many individuals would not prosecute their actions separately outside of the class action mechanism. At this time, it is indeterminable how much each of these factors influences the members of the putative class since the class remains fluid.

The second factor is the extent and nature of litigation already commenced by or against the class members. As noted above, Plaintiffs' counsel has represented that other actions are simultaneously proceeding. Aside from knowing about the existence of these other cases, the Court has little information on the numbers of these cases and the stages they have reached in the litigation.

The third factor is the desirability or undesirability of concentrating the litigation of the claims in this particular forum. The Court finds that this factor clearly weighs against class certification. Unlike, for example, the standard securities class action, this suit, under the Plaintiffs' trial plan, will necessarily require an individual Stage 2 trial for every plaintiff. However the Stage 2 trials might be worked out by stipulation they would create a severe burden on the Court and the parties. Lacking appropriate stipulations, the problem of the Stage 2 trials would be virtually insurmountable.

The final factor is the difficulties likely to be encountered in the management of the case. This factor, too, weighs against class certification for the reasons already stated.

As a whole, the Court finds that the factors under Rule 23(b)(3)(A)-(D) counsel against class certification.

## B. Injunctive Relief Classes

Plaintiffs ask the Court to create a national subclass that would pursue injunctive relief to 1) establish a medical information clearinghouse where physicians and patients would be able to access current information about Paxil withdrawal symptoms and 2) prohibit GSK from further making any statements found to be misleading by the Stage 1 jury.  The injunctive relief class is alleged to be certifiable under both Rule 23(b)(2) and (b)(1).

### 1. Injunctive Relief Certification under Rule 23(b)(2)

Plaintiffs' statement that "[d]ifferences amongst state law regarding equitable relief, if any, do not defeat manageability of Plaintiffs' requested (b)(2) subclass" (Reply I at 31.) is incorrect. While the Court has discretion to fashion appropriate equitable relief, such relief must be founded upon some underlying legal violation.  Moreover, in determining whether to certify a class under Rule 23(b)(2), this Court is entitled to and should take into account whether the putative class shares common issues of law and fact.  *See Yassini v. Crosland*, 613 F.2d 219, 220 (9th Cir. 1980) (rejecting lower court's 23(b)(2) certification in the absence of a common question of fact or law ripe for judicial determination).  Hence, the problems that are fatal to Rule 23(b)(3) certification are likewise fatal to Rule 23(b)(2) certification.

### 2. Rule 23(b)(1)(A) Injunctive Class

Plaintiffs' alternative proposal to certify the information clearinghouse under Rule 23(b)(1)(A) is also untenable and must be denied.  A class action is maintainable under Rule 23(b)(1)(A) if

"prosecution of separate actions . . . would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class. . . ." Fed. R. Civ. P. 23(b)(1)(A). The phrase "incompatible standards of conduct" refers to the situation where "different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." Wright, Miller & Kane, *Federal Practice and Procedure 7A*: § 1773 at 431 (2d ed. 1986) (footnote omitted).

Plaintiffs fail to demonstrate how the information clearinghouse they seek might subject GSK to inconsistent responsibilities. Plaintiffs' description of the remedy sought does attempt to define generally what GSK's responsibilities would be and to whom. Plaintiffs propose: "a medical information program which includes notification of the problem with Paxil withdrawal and a clearinghouse of the most up-to-date, accurate information about the above-specified withdrawal symptoms and how to best avoid or lessen them when trying to get off Paxil." (Reply I at 22.) The responsibility for this program apparently would be GSK's.

It is, of course, impossible to tell how GSK might be required to discharge this duty from state to state or court to court. But it is clear, however, that the overwhelming possibility of serious harm from such a proposal makes any discussion of consistency seem pointless. Paxil is a prescription drug and the doctors' role in the plan is overlooked by the Plaintiffs. What Plaintiffs suggest is dangerous whether it would save GSK from inconsistent orders or not.

28

## C. Rule 23(b)(1)(B) Punitive Damages Class

### 1. Limited Funds

For this class, Plaintiffs rely on Rule 23(b)(1)(B), which provides for class certification where:

> adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

Fed. R. Civ. P. 23(b)(1)(B). The purpose of Rule 23(b)(1)(B) is to protect plaintiffs in situations where separate lawsuits might exhaust a defendant's resources such that earlier plaintiffs might recover at the expense of later plaintiffs. Consistent with this rationale, Rule 23(b)(1)(B), read with subdivision (c)(2), does not allow absent class members to receive notice or to exclude themselves. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 883 (1999).

That the class members are both bound by the judgment and yet not entitled to notice raises strong due process concerns. Hence, Rule 23(b)(1)(B) is narrowly construed and courts are wont to certify under Rule (23)(b)(1)(B) except in the most compelling situations. *See Ortiz*, 527 U.S. at 842-45. As Plaintiffs concede, a mere allegation that the defendant has limited resources is insufficient to support Rule 23(b)(1)(B) certification. *See, e.g., In re N. Dist. of Ca. Dalkon Shield IUD Prods. Liability Lit.*, 693 F.2d 847 (9th Cir. 1982); *Zinser*, 253 F.3d at 1180.

Yet "mere allegation" is exactly what Plaintiffs proffer. They have neither ascertained GSK's financial condition nor adduced any evidence that they will be entitled to punitive damages should they prevail. (Reply I at 68.)

Nor do Plaintiffs explain how a punitive damages award could be equitably split among the plaintiff class. One hallmark of a case certifiable under Rule 23(b)(1)(B) is that the "claimants identified by a common theory of recovery [are] treated equitably among themselves." See Ortiz, 527 U.S. at 841. Plaintiffs offer no explanation as to how the putative class would equitably split a punitive damages award amongst members who would have been entitled to sue under different laws and subject to different defenses.

**2. Punitive Damages Limitations**

Finally, Plaintiffs invite the Court to follow the reasoning of Simon II to certify a class action on the theory that a punitive damages limit justifies the creation of a limited action class. See In re Simon II Litigation, 2002 U.S. Dist. LEXIS 19773 (E.D.N.Y. 2002). In Simon II, a tobacco litigation, the court noted that in recent years, the Supreme Court has developed a constitutional doctrine to control punitive damages through greater court supervision. See id. at *15. This constitutional cap, the court reasoned, provides the limited fund necessary for certification under Rule 23(b)(1)(B).

For the sake of its analysis, the Court assumes (without in any way suggesting) that the theory adopted in Simon II is a viable one. Even with this assumption, the Court must decline Plaintiffs' invitation to certify a limited fund class here.

Initially, Plaintiffs fail to demonstrate that they would be entitled to a punitive damages award. Before certification on the basis of a punitive damages cap, the Court must scrutinize whether the Plaintiffs here have a legitimate chance of 1) recovering punitive

30

damages 2) large enough to breach the punitive damages cap. As a result of extensive discovery and numerous previous trials, the *Simon II* court had available such evidence suggesting that punitive damages might be available. No such evidence or arguments are advanced by Plaintiffs.

Furthermore, the method in which Plaintiffs propose to try the case does would not solve the problem that *Simon II* contemplates. By trying each case separately, each Stage 2 jury would have no idea how much another jury was awarding to other class members. Thus, no jury would possess the knowledge necessary to determine what the overall punitive damages should be and how those damages should be applied to the different classes. The overall cap might thus exceed any Constitutional cap.

## IV. Conclusion

For the reasons stated above, Plaintiffs' Motion for Class Certification is DENIED. GSK's Motion to Strike Designations of Tina Hanke and Christina S. Robinson is GRANTED. GSK's Motion to Strike the Declaration of Karen A. Barth in Support of Plaintiffs' Reply to GSK's Opposition to Plaintiffs' Motion for Class Certification is GRANTED.

Plaintiffs are given leave to submit one more Motion for Class Certification. Any such Motion must set forth in detail a workable class definition and trial plan. Additionally, while the substance of any motion is ultimately determined by the filing party, the Court has grave doubts about the viability of any multi-state class action proposal. If the Plaintiffs wish to file an additional revised Motion for Class Certification, they shall notify GSK and agree upon an

acceptable time schedule for the filing of papers and for a hearing. A stipulation as to the schedule shall be filed with the Court by January 20, 2003.

IT IS SO ORDERED.

DATED: _January 10, 2003_          _Mariana R Pfaelzer_
                                    Honorable Mariana R Pfaelzer

                                    United States District Judge